**Robert D. HAXBY, Debtor–Appellant,**

v.

**NATIONAL BOULEVARD BANK OF CHICAGO, A National Banking Association, Plaintiff–Appellee.**

**Nos. 88 C 1806, 85 B 6321 and 85 A 924.**

United States District Court, N.D. Illinois, E.D.

Sept. 16, 1988.

Mitchell S. Lipkin, Gordon & Gordon, Ltd., Chicago, Ill., for debtor-appellant.

Michael L. Gesas, Nicholas G. Manos, Gesas, Pilati and Gesas, Ltd., Chicago, Ill., for plaintiff-appellee.

### ORDER

BUA, District Judge.

Pursuant to 11 U.S.C. § 523(a)(2)(B), the bankruptcy court in this Chapter 7 proceeding excepted from discharge a loan that debtor had received from a Chicago bank. The bankruptcy court also awarded attorneys' fees to the bank's counsel. Debtor now appeals these two rulings. For the reasons stated herein, this court affirms the decision of the bankruptcy court.

### FACTS

The debtor in this case, Robert Haxby, owns and operates Triangle Truck Enterprises ("Triangle Truck"), a truck repair business, and Tri–Fridge Corporation ("Tri–Fridge"), an interstate carrier of frozen food products. In mid–1982, Haxby sought capital financing for Tri–Fridge. Russell Steger, an acquaintance of Haxby and a customer of the National Boulevard Bank of Chicago ("Bank"), arranged for a meeting between Haxby and representatives of the Bank. On October 22, 1982, Haxby and Bank officials discussed his prospects for obtaining a $100,000 loan from the Bank.

The Bank entrusted Thomas Panos, an assistant vice president, with the task of evaluating Haxby's loan application. On October 27, 1982, Panos received an unsigned financial statement from Haxby. According to this statement, which was prepared on June 30, 1982, Haxby's total assets amounted to $1,748,171. These assets included Triangle Truck and Tri–Fridge (valued at $400,000 and $180,000, respectively) as well as Triangle Truck's corporate headquarters, a building located at 3300 West 93rd Street, Evergreen Park, Illinois (valued at $650,000). Haxby also submitted to Panos an independent appraisal of the Triangle Truck property. This appraisal, conducted in 1980, estimated the property's value at $550,000.

After reviewing the financial statement and the property appraisal, Panos concluded that the Bank could not extend a loan to Haxby unless he offered the Triangle Truck property as collateral. In the course of reviewing Haxby's loan application, Panos discovered several facts about the property that might detract from its value. A title search revealed that Talman Federal Savings & Loan Association of Chicago held two mortgages on the Triangle Truck property totaling nearly $180,000. Panos also learned that Haxby owed more than $17,000 in back taxes on the property. In addition, Haxby admitted his involvement in a pending lawsuit concerning the property. Fully aware of these facts, the Bank nonetheless approved Haxby's loan request, accepting the Triangle Truck property as collateral.

At the time they authorized the Haxby loan, Bank officials knew nothing of a May 1982 proposal by the Village of Evergreen Park to rezone the Triangle Truck property from commercial to residential use. Haxby, who had earlier objected to the rezoning at a public hearing, clearly knew about the Village's proposal when he applied for the loan; yet he never mentioned the prospect of rezoning to Panos or anyone else at the Bank. On the morning of November 1, 1982, Haxby learned that the Village Board

of Trustees would vote on the rezoning recommendation that evening. Later that day, he went to the Bank to sign his personal financial statement. By signing the financial statement, Haxby purportedly verified its accuracy. The statement, however, made no reference to the potential rezoning of the Evergreen Park property. Moreover, Haxby failed to inform anyone at the Bank about the impending vote on the rezoning ordinance.

On the evening of November 1, 1982, the Evergreen Park Board of Trustees adopted Ordinance No. 18–1982, which rezoned the Triangle Truck property from commercial to residential use. Unaware of the zoning change, the Bank proceeded to issue the loan to Haxby. He received the proceeds of the loan in two installments—$70,000 on November 4, 1982 and $30,000 on November 12, 1982. Before he accepted the second installment of the loan, Haxby learned that the Village Board had enacted the rezoning ordinance. Nonetheless, at the time he accepted the Bank's funds, Haxby did not tell anyone at the Bank about the rezoning. Bank officials first became aware of the zoning change on August 9, 1983, when Haxby submitted a new financial statement. This statement vaguely referred to a recent zoning change that might negatively affect the value of the Evergreen Park property.

Even as he was concealing the zoning change from Bank officials, Haxby was simultaneously mounting a legal challenge to the rezoning ordinance. He ultimately prevailed in court. On May 13, 1985, Circuit Court Judge James Murray struck down the rezoning ordinance as unconstitutional, restoring the Triangle Truck property to its previous commercial status.

Haxby filed for Chapter 11 bankruptcy on May 17, 1985. (His bankruptcy petition was later converted to a Chapter 7 proceeding.) Shortly after Haxby filed for bankruptcy, the Bank objected to the discharge of its $100,000 loan to Haxby. The Bank urged the bankruptcy court to except the loan from discharge because Haxby's 1982 financial statement had made no reference to the rezoning and had overstated the value of his assets. After holding a two-day trial on the issue, Bankruptcy Judge Susan Pierson DeWitt decided to rule in the Bank's favor. In an order entered on January 22, 1988, Judge DeWitt excepted the Bank's loan from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). She also granted the Bank's request for $3,000 in attorneys' fees. Haxby now appeals Judge DeWitt's order.

## DISCUSSION

Haxby's appeal raises two issues. First, did the bankruptcy court properly except the Bank's loan from discharge? Secondly, did Judge DeWitt appropriately authorize an award of attorneys' fees? In resolving these issues, this court must accept the bankruptcy court's findings of fact unless clearly erroneous. See *In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986). The bankruptcy court's conclusions of law, however, are subject to *de novo* review. *Id.*

### I. Exception from Discharge

In excepting the Bank's loan from discharge, the bankruptcy court relied on 11 U.S.C. § 523(a)(2)(B), which states in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money ... to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money ... reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

The critical inquiry on appeal revolves around the four factors listed under § 523(a)(2)(B). In order to establish an exception to discharge, a creditor must prove

these four factors by clear and convincing evidence. *In re Bogstad*, 779 F.2d 370, 372 (7th Cir.1985). Haxby contends that the Bank has not met its burden of proof with respect to two of these factors: material falsehood and reasonable reliance.

■ Haxby initially attacks the bankruptcy court's finding of material falsehood. He notes that after the invalidation of the rezoning ordinance, the Bank held exactly the same collateral it had originally accepted—a beneficial interest in a piece of property zoned for commercial use. Haxby claims that because the rezoning did not ultimately impair the value of the Bank's collateral, the financial statement's failure to mention the rezoning did not amount to a material omission. This argument completely misses the point. Even if a misstatement or omission in a loan application causes no apparent harm to a lender, such a misrepresentation is material if knowledge of the debtor's true financial condition would have dissuaded the lender from making the loan in the first place. *Id.* at 375.

If Haxby's 1982 financial statement had acknowledged the possibility of a zoning change in the Triangle Truck property, it is extremely unlikely that the Bank would ever have granted the loan. After all, Haxby's loan application did not meet with automatic approval. From the start, Bank officials harbored doubts about whether Haxby would be a good credit risk. That is why the Bank conditioned approval of the loan on Haxby's provision of the Triangle Truck property as collateral. When they accepted the collateral and approved the loan, Bank officials already knew about several factors that could negatively affect the value of the Triangle Truck property. Unbeknownst to the Bank, the potential for rezoning further tainted the property's value. Had Bank officials learned of the prospective zoning change, they almost certainly would have refused to accept the property as collateral. In addition, the evidence at trial revealed that Haxby's financial statement seriously overstated the value of his businesses as well as his annual income. Considering the Bank's initial reluctance to approve his loan, Haxby would probably not have obtained capital financing if his financial statement had reflected the actual value of his assets. In light of all the evidence adduced at trial, the Bank has amply demonstrated that the misrepresentations in Haxby's 1982 financial statement were material.

According to the bankruptcy court, the Bank also established that it reasonably relied on the financial statement in approving Haxby's loan application. Haxby challenges this finding of reasonable reliance. He claims that the Bank based its loan decision not on his financial statement, but on the 1980 appraisal of the Triangle Truck property. Haxby also suggests that Steger's intercession on his behalf may have been the decisive factor in the Bank's approval of the loan. The record, however, contains no evidence that Steger exerted any undue influence. In fact, the Bank required Haxby to undergo the same application process endured by every other loan applicant. Furthermore, after hearing Panos' testimony at trial, the bankruptcy court concluded that the Bank had relied on both the 1980 appraisal and the 1982 financial statement. This court sees no reason to disturb this finding of fact. It seems obvious that the Bank relied at least in part on Haxby's misrepresentations; and even partial reliance on a false financial statement can provide an adequate basis for an exception to discharge. *In re Ardelean*, 28 B.R. 299, 301 (Bankr.N.D.Ill.1983).

Finally, Haxby contends that the bankruptcy court should not have excepted the Bank's loan from discharge because the Bank suffered no harm as a result of Haxby's misrepresentations. He asserts that the invalidation of the rezoning ordinance has rendered the Bank's objections moot by restoring the Triangle Truck property to its previous zoning status. Haxby also posits that the Bank's present predicament stems not from the financial statement's misrepresentations, but from the Bank's own ill-advised decision to grant a loan to a poor credit risk. These arguments amount to nothing more than a smokescreen. Contrary to Haxby's assertions, the misrepresentations made by his financial statement have played an integral role in the Bank's

current dilemma. If Haxby had accurately reported the value of his assets, including disclosure of the potential rezoning of the Triangle Truck property, the Bank would never have approved the loan; and if the loan had never been granted, the Bank would not now have to seek an exception to discharge. Based on what they knew at the time, perhaps Bank officials showed poor judgment when they approved Haxby's loan; but this does not absolve Haxby, who must now suffer the consequences of his own duplicity. Having reviewed the trial record, this court affirms the bankruptcy court's finding of an exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(B).

## II. Attorneys' Fees

Haxby also contests the bankruptcy court's award of attorneys' fees to the Bank's counsel. The Bank explicitly asked for attorneys' fees when it submitted a proposed judgment order to the bankruptcy court on November 2, 1987. Three days later, the bankruptcy court indicated that although it planned to adopt most of the Bank's proposed order, it intended to deny the request for fees. For some reason, however, the court never entered an order to this effect. On January 14, 1988, the Bank moved for entry of an order *nunc pro tunc* November 2, 1987. The draft order submitted with this motion made no reference to attorneys' fees. Based on this omission, Haxby maintains that the Bank expressly withdrew its request for attorneys' fees, leaving the bankruptcy court with no basis for awarding fees when it finally entered judgment on January 22, 1988. This court simply cannot accept Haxby's portrayal of the Bank's January 1988 motion. The Bank's failure to mention attorneys' fees in its proposed *nunc pro tunc* order did not constitute an express withdrawal of its previous fee request. Rather, the Bank merely fashioned its newly proposed order to reflect the bankruptcy court's previously stated intentions, including the denial of attorneys' fees. Absent an explicit statement by the Bank withdrawing its fee request, Judge DeWitt remained free to reconsider the issue of attorneys' fees. She acted well within her discretion when she ultimately decided to award fees to the Bank's counsel. Consequently, this court upholds the fee award in this case.

## CONCLUSION

For the foregoing reasons, this court affirms the decision of the bankruptcy court.

IT IS SO ORDERED.